FILED

2024 Feb-20  PM 03:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**TANYA LYNN MAUSEHUND,**
　　　　Plaintiff,

**v.**

**MARTIN J. O'MALLEY,**
**Commissioner of the Social**
**Security Administration,**
　　　　Defendant.

**Case No. 5:22-cv-1523-CLM**

## <u>MEMORANDUM OPINION</u>

　　　Tanya Lynn Mausehund seeks disability and disability insurance benefits from the Social Security Administration ("SSA") based on several impairments. The SSA denied Mausehund's application in an opinion written by an Administrative Law Judge ("ALJ").

　　　Mausehund argues that the ALJ erred by: (1) not adequately evaluating her mental impairments and resulting functional limitations; (2) not properly evaluating the opinion evidence; (3) rejecting Mausehund's subjective pain testimony and not adequately addressing her obesity in assessing her residual functional capacity; and (4) relying on the vocational expert's testimony to find Mausehund not disabled. As detailed below, the ALJ applied the correct legal standards and substantial evidence supports her decision. So the court will **AFFIRM** the SSA's denial of benefits.

## I.　STATEMENT OF THE CASE

　　　This is the second time that Mausehund has appealed the SSA's denial of her application for disability and disability insurance benefits. Before the court discusses Mausehund's two unfavorable decisions, the court will detail Mausehund's impairments, as she told them to the ALJ.

### A.    Mausehund's Disability, as told to the ALJ

Mausehund was 32 on her alleged disability onset date and 35 on her date last insured. (R. 209, 216). She has a high school education and past work as an assistant manager, cashier, and computer tech. (R. 220).

In her disability report, Mausehund alleged that she suffered from degenerative disc disease, neuropathy, and pseudotumor. (R. 219). At the ALJ hearing, Mausehund testified that during the relevant period (2012 to 2015) she suffered from headaches that she rated a 10 on the pain scale "just about every day." (R. 1029). No medicine or treatment helped Mausehund with her headaches, and she would often lay in bed for hours because of them. (*Id.*). Once or twice a month, Mausehund would go to the ER because her headaches would cause her to throw up and make it where she couldn't lift her head off her pillow. (R. 1030–31). Since that time, Mausehund's headaches have gotten better through Botox treatments. (R. 1031).

Mausehund also suffered intense back pain. (*Id.*). Because of the back pain, Mausehund said that she experienced days she couldn't move about three weeks a month. (*Id.*). This pain causes Mausehund to feel a shooting, burning sensation all the way down her legs and into her toes. (R. 1032). It also caused Mausehund to feel like she was on a bed of coals. (*Id.*).

Mausehund has neuropathy in the middle of her body and thighs. (R. 1034). Taking Cymbalta helps control her neuropathy. (*Id.*). When Mausehund doesn't take Cymbalta, even movement badly hurts her. (*Id.*). And though the Cymbalta helps, cold weather still causes her pain. (*Id.*).

Mausehund receives treatment for depression because she is angry about her back pain and inability to function as a normal person with her kids. (R. 1035–1036). Though Mausehund's had problems with depression since 2002, it flared up when she had to stop working. (R. 1036).

Since Mausehund stopped working, she starts most days by getting up and sitting on the couch, trying to watch TV. (R. 1035). Mausehund then goes back and forth between the couch and the bed, estimating that she spends around 99% of her time in either location. (*Id.*). Mausehund lives with her two daughters who she says do the household chores. (R. 1027, 1035).

### B.    The First ALJ Decision

The SSA reviews applications for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1-4).

Mausehund applied for disability and disability insurance benefits in December 2012. After receiving an initial denial in July 2013, Mausehund requested an ALJ hearing, which the ALJ conducted in September 2016. A month later, the ALJ denied Mausehund's request for benefits, finding that Mausehund could perform a limited range of light work, which meant that she could work as a ticket taker, office helper, and survey worker.

The Appeals Council denied Mausehund's request to review the ALJ's decision, and Mausehund appealed the denial of benefits to the Northern District of Illinois. That court granted the Commissioner's motion to remand Mausehund's claims under sentence four of 42 U.S.C. § 405(g) for re-evaluation of opinion evidence from Dr. Syeda Farheen Ali and further development of the record on Mausehund's mental impairments.

### C.    Determining Disability

Before detailing the second ALJ decision the court lays out the SSA's five-step process to determine whether an individual is disabled and thus entitled to benefits under the Social Security Act:

| The 5-Step Test | | |
|---|---|---|
| Step 1 | Is the Claimant engaged in substantial gainful activity? | If yes, claim denied. If no, proceed to Step 2. |
| Step 2 | Does the Claimant suffer from a severe, medically-determinable impairment or combination of impairments? | If no, claim denied. If yes, proceed to Step 3. |
| Step 3 | Does the Step 2 impairment meet the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1? | If yes, claim granted. If no, proceed to Step 4. |

| | *Determine Residual Functional Capacity* | |
|---|---|---|
| Step 4 | Does the Claimant possess the residual functional capacity to perform the requirements of his past relevant work? | If yes, claim denied. If no, proceed to Step 5. |
| Step 5 | Is the Claimant able to do any other work considering his residual functional capacity, age, education, and work experience? | If yes, claim denied. If no, claim granted. |

*See* 20 C.F.R. §§ 404.1520(a), 404.1520(b) (Step 1); 20 C.F.R. § 404.1520(c) (Step 2); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526 (Step 3); 20 C.F.R. § 404.1520(e-f) (Step 4); 20 C.F.R. § 404.1520(g) (Step 5).

As shown by the gray-shaded box, there is an intermediate step between Steps 3 and 4 that requires the ALJ to determine a claimant's "residual functional capacity," which is the claimant's ability to perform physical and mental work activities on a sustained basis.

## D.    The Second ALJ Decision

The ALJ conducted a second hearing on Mausehund's claim for benefits in February 2020. A few weeks later, the ALJ issued a second unfavorable decision.

At Step 1, the ALJ determined that Mausehund was not engaged in substantial gainful activity and thus her claims would progress to Step 2.

At Step 2, the ALJ determined Mausehund suffered from the following severe impairments: idiopathic intracranial hypertension (pseudo-tumor cerebi) with shunt placement; headaches; obesity; small fiber neuropathy and lumbar degenerative disc disease. The ALJ found that Mausehund's depression was a non-severe impairment.

At Step 3, the ALJ found that none of Mausehund's impairments, individually or combined, met or equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. So the ALJ next had to determine Mausehund's residual functional capacity.

The ALJ determined that Mausehund had the residual functional capacity to perform light work with these added limitations:

- Mausehund could stand and/or walk for four hours in an eight-hour workday and can sit for up to six hours in an eight-hour workday.

- Mausehund could lift and carry up to twenty pounds occasionally and ten pounds frequently.

- Mausehund was limited to work requiring only occasional operation of foot controls; no climbing ladders, ropes, or scaffolding; and only occasional climbing of ramps or stairs.

- Mausehund could occasionally balance, stoop, kneel, crouch, or crawl.

- Mausehund was limited to work that required no commercial driving, no work at unprotected heights, no concentrated exposure to vibration, and no concentrated exposure to hazards (defined as work at heights or operation of dangerous moving machinery like a forklift).

- Mausehund's work should involve simple instructions and routine tasks and no work that requires frequent use of field of vision or frequent far acuity.

At Step 4, the ALJ found that Mausehund could not perform her past relevant work. At Step 5, the ALJ determined that Mausehund could perform jobs, such as table worker, document preparer, and addresser, that exist in significant numbers in the national economy and thus Mausehund was not disabled under the Social Security Act.

Mausehund requested an Appeals Council review of the ALJ's decision. The Appeals Council considered the reasons Mausehund disagreed with the ALJ's decision and found no reason to assume jurisdiction.

## II. STANDARD OF REVIEW

This court's role in reviewing claims brought under the Social Security Act is narrow. The scope of the court's review is limited to (a) whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and (b) whether the ALJ applied the correct legal standards, *see Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford*, 363 F.3d at 1158.

## III. LEGAL ANALYSIS

Mausehund makes four arguments for why the ALJ erred. First, Mausehund argues that the ALJ didn't adequately evaluate her mental functioning and resulting functional limitations at Steps 2 and 3 of the five-step process. Second, Mausehund asserts that the ALJ inadequately evaluated the opinion evidence in the record. Third, Mausehund contends that the ALJ erred in rejecting her subjective pain testimony and not considering her obesity in assessing her residual functional capacity. Finally, Mausehund states that the ALJ erred in relying on the vocational expert's testimony to find her not disabled because the hypothetical provided the vocational expert was incomplete. The court will address each argument in turn.

### A.   Mental Functioning + Listings

Mausehund first argues that the ALJ erred in assessing her mental impairments at Steps 2 and 3 of the five-step process. At Steps 2 and 3, an ALJ must consider the medical severity of the claimant's impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(a)(4)(iii). In evaluating the severity of a mental impairment, the ALJ must first rate the degree of the claimant's functional limitation in these four areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or

maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(c).[1] If the ALJ rates the claimant's functional limitations as "none" or "mild," the ALJ "will generally conclude that [her] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation of [her] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). If the mental impairment is severe, the ALJ will determine whether it meets or is equal in severity to a listed mental disorder "by comparing the medical findings about [the claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." 20 C.F.R. § 404.1520a(d)(2).

1. <u>Step 2</u>: At Step 2, the ALJ considered Mausehund's medically determinable mental impairment of depression under the four broad areas of mental functioning (*i.e.*, the paragraph B criteria). (R. 995–97). The ALJ determined that Mausehund had no limitation in any of the four areas. (*Id.*).

In assessing Mausehund's ability to understand, remember, or apply, information, the ALJ noted that Mausehund reported during a February 2013 appointment that she had been diagnosed with depression more than 10 years before the appointment. (R. 995, 1588). The ALJ also noted that Mausehund's function report from the relevant period states that she doesn't need to be reminded to care for her personal hygiene or to take her medications. (R. 995, 243). Plus, Mausehund reported that she could follow written and spoken instructions well "depending on what it is." (R. 995, 246). Finally, the ALJ explained that Mausehund didn't receive treatment from a mental health provider during the relevant period and that her mental status exams didn't show cognitive, thought process, or memory issues. (R. 995, 379, 504, 701, 706–07, 715, 739, 801, 1658, 2722).

The ALJ next addressed Mausehund's ability to interact with others. The ALJ first noted that Mausehund was treated for anger management issues in December 2016 after an incident in August 2015 in which she yelled at emergency room staff. (R. 996, 1689–90). Later that month, Mausehund's treating physician diagnosed her with excessive anger because she was "very aggressive and having pressure speech" when talking to him about the

---

[1] These functional areas are the functional areas that an ALJ must consider for all claims pending on or after January 17, 2017, including Mausehund's. *See* 81 Fed. Reg. 66138.

ineffectiveness of her pain killers. (R. 1771). But these incidents occurred after Mausehund's date last insured (*i.e.*, June 30, 2015), and the record doesn't suggest that Mausehund didn't get along with others or had mood abnormalities during the relevant period. (R. 996).

In evaluating Mausehund's ability to concentrate, persist, or maintain pace, the ALJ noted that Mausehund stated in her function report that she could maintain her attention for a long time, finish what she started, and that she had no issues handling money, bills, or bank accounts. (R. 996, 244, 246). And the ALJ reiterated that Mausehund's mental status exams during the relevant period didn't show deficits in attention, concentration, thought process, or cognitive functioning. (R. 996, 379, 504, 701, 706–07, 715, 739, 801, 1658, 2722). The ALJ finally addressed Mausehund's ability to adapt or manage herself. In her function report, Mausehund reported that "some days" her impairments affected her ability to dress and bathe and that she doesn't shave. (R. 242). But her impairments didn't affect her ability to care for her hair, feed herself, or use the toilet. (*Id.*). And though Mausehund prepares her own meals, she doesn't do housework. (R. 243). Mausehund also said that she could travel alone, shopped in stores, and could handle changes in her routine. (R. 996, 224, 227). But Mausehund reported not handling stress well. (R. 227). The medical records before Mausehund's date last insured don't suggest she had issues with hygiene or grooming. And the ALJ explained that nothing suggested that Mausehund reported any issues managing daily life because of her mental limitations during the relevant period. (R. 996).

Mausehund says that the ALJ erred in evaluating her mental functioning by: (1) not adequately documenting how she evaluated Mausehund's mental impairments under the psychiatric review technique; (2) relying on her own medical judgments to assess Mausehund's functional limitations; and (3) in not considering that Mausehund receives psychotropic medicine from her primary care physician or whether her depression is recurrent. The court addresses each argument below.

a. The ALJ's detailed discussion of the evidence of Mausehund's mental functioning shows that she complied with § 404.1520a's requirements for evaluating mental impairments. The ALJ's decision shows that she considered Mausehund's medical history, "including examination and laboratory findings,

and . . . functional limitations" in determining that Mausehund's depression was not a severe impairment. *See* 20 C.F.R. § 404.1520a(e)(4). And the ALJ made specific findings about Mausehund's degree of limitation in each of the four functional areas. *See id.* So the court rejects Mausehund's argument that the ALJ didn't apply the correct legal standard and failed to adequately document how she applied the psychiatric review technique to assess the severity of Mausehund's depression.

b. Nor has Mausehund shown that the ALJ improperly relied on her own judgment to determine that Mausehund's depression wasn't a severe impairment. "[T]he ALJ may not make medical findings herself." *Ybarra v. Comm'r of Soc. Sec.*, 658 F. App'x 538, 543 (11th Cir. 2016). But it is the role of the ALJ to consider the medical and nonmedical evidence in the record to determine the severity of a claimant's physical or mental impairments. *See* 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ fulfilled that role here by pointing to substantial evidence in the record that supports her determination that during the relevant period Mausehund had no functional limitations and her depression was a non-severe impairment. So the court rejects Mausehund's argument that the ALJ impermissibly played doctor.

c. Mausehund's final argument for why the ALJ erred at Step 2 is that the ALJ needed to (a) consider her prescriptions for psychotropic medicine, and (b) question Mausehund at the ALJ hearing about whether her depression is recurrent or caused her to exhibit characteristics that would render her unfit for full-time work. As explained, the ALJ pointed to substantial evidence to support her determination that Mausehund had no functional limitations and that her depression wasn't severe. And though Mausehund's progress notes show that she was prescribed Depakote and Lorazepam, (R. 460, 467), Mausehund doesn't point to any evidence that she was prescribed these medications to treat depression or explain what functional limitations the court can infer from her taking these medications.

Nor has Mausehund shown that the mere fact that she took psychotropic medication would compel the conclusion that her depression was a severe impairment. Besides, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" as long as the decision is not "a broad rejection" that casts doubt on whether the ALJ considered the claimant's

"medical condition as a whole." *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). Having considered the ALJ's assessment of Mausehund's mental functioning and the record evidence, the court finds that the ALJ adequately considered Mausehund's "medical condition as a whole" when she evaluated Mausehund's mental impairments.

The court is also unconvinced that the ALJ needed to ask Mausehund more questions about her depression at the ALJ hearing. At the hearing, the ALJ discussed with Mausehund that she first reported being depressed in 2002 and about various prescriptions in the record related to depression. (R. 1035–38). Plus, Mausehund was represented by an attorney at the hearing who asked her questions about her anger and depression and could have elicited more testimony about whether Mausehund's depression was recurrent and about whether it affected any work-related characteristics. (R. 1047–48). Given that there was sufficient evidence in the record for the ALJ to evaluate Mausehund's functional limitations from 2012 to 2015, the court finds that the ALJ didn't need to further develop the record by asking more depression-related questions at the ALJ hearing.

—

In sum, Mausehund hasn't shown that the ALJ erred in evaluating her medically determinable impairment of depression at Step 2 and determining that it wasn't a severe impairment.

2. <u>Step 3</u>: Mausehund also argues that the ALJ erred at Step 3 saying, "[t]he ALJ erred by failing to undertake an equivalence assessment, including all impairments in combination. This failure harmed Plaintiff because a proper equivalence assessment may have led to a *per se* finding of disability." (Doc. 14, p. 9). The court agrees with the Commissioner that this argument is inadequate because Mausehund doesn't explain why she contends the ALJ didn't consider her impairments in combination, cite any authority to support her argument that the ALJ's assessment was deficient, or explain what listing Mausehund's combination of impairments would have equaled. *See Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) ("[A]n appellant's simply stating that an issue exists without further argument or discussion, constitutes abandonment of that issue.").

On the merits, Mausehund's Step 3 argument also fails. In her Step 3 analysis, the ALJ found that Mausehund "did not have an impairment **or combination of impairments** that met or medically equaled the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1." (R. 997 (emphasis added)). The ALJ also stated that "[t]he medical evidence does not document listing-level severity and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually **or in combination**." (*Id.* (emphasis added)). Under Eleventh Circuit caselaw, these statements show that the ALJ adequately considered whether the combined effects of Mausehund's impairments met or equaled a listing. *See Jones v. Dep't of Health & Hum. Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991).

To the extent that Mausehund argues that the ALJ erred in not finding that her depression met Listing 12.04, the ALJ stated that her Step 2 finding that Mausehund's depression wasn't severe supported finding that Mausehund didn't meet or equal Listing 12.04. (R. 998). To meet Listing 12.04, a claimant must either: (a) have an extreme limitation in one, or marked limitation in two, of the areas of mental functioning; or (b) have a mental disorder that is "serious and persistent." *See* 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.04. As explained, substantial evidence supports the ALJ's finding that Mausehund has no limitations in the four areas of mental functioning. And the evidence of Mausehund's depression discussed in Step 2 supports a finding that Mausehund's depression wasn't "serious and persistent." So the ALJ didn't err in her Step 3 analysis.

## B. Opinion Evidence

Mausehund's second argument is that the ALJ erred in evaluating the opinion evidence in the record. Under the regulations that apply to Mausehund's claim for benefits, an ALJ must give a treating physician's opinion substantial or considerable weight absent good cause to discount the opinion. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* And "opinions of nonexamining, reviewing

physicians . . . when contrary to those of the examining physicians are entitled to little weight, and standing alone do not constitute substantial evidence" that a treating or examining physician's opinion is invalid. *See Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987).

1. Dr. Ali: Dr. Ali has been Mausehund's treating physician since 2014 and completed a physical medical source statement on Mausehund's behalf in 2016. (R. 944–49). In the medical source statement, Dr. Ali stated that Mausehund suffered from back pain and anger issues. (R. 945). Dr. Ali also stated that Mausehund's depression would affect her physical condition and that Mausehund's pain and other symptoms would often interfere with attention and concentration. (R. 946). Dr. Ali then stated that Mausehund would have a moderate limitation in her ability to deal with work stress and need to rest after walking 2 or 3 city blocks. (R. 946–47). But Dr. Ali found that Mausehund could continuously sit or stand for more than 2 hours and sit or stand/walk for about 4 hours in an 8-hour workday. (R. 947).

Dr. Ali next explained that Mausehund needed a job that would let her shift positions from sitting, standing, or walking but that she didn't need to elevate her legs or use a cane or other assistive device. (R. 947–48). And according to Dr. Ali, Mausehund could frequently lift and carry less than 10 lbs, occasionally lift and carry 10 or 20 lbs, and never lift and carry more than 50 lbs. (R. 948). Plus, Dr. Ali found that Mausehund didn't have significant limitations in doing repetitive reaching, handling, or fingering and that Mausehund could spend more than 75% of an 8-hour workday using her hands, fingers, and arms to engage in various repetitive activities. (*Id.*). Finally, Dr. Ali stated that Mausehund could bend and twist at the waist 50% of the time during an 8-hour workday. (*Id.*).

The ALJ gave Dr. Ali's opinion that Mausehund could lift and carry up to twenty pounds occasionally and that she could stand or walk for a total of 4 hours in an 8-hour day great weight because they aligned with exam findings that showed tenderness in Mausehund's lower back and a reduced range of motion in Mausehund's lumbar spine as well as imaging of Mausehund's spine. (R. 1008–09). But the ALJ gave the other aspects of Dr. Ali's opinions little weight, finding that they contradicted Dr. Ali's treatment notes and other medical evidence in the record. (R. 1009). For example, the ALJ found that

nothing in Dr. Ali's treatment notes or Mausehund's other medical exams supported Dr. Ali's opinions that Mausehund could sit for only 4 hours in an 8-hour day and needed to alternate between sitting and standing. (*Id.*). The ALJ also rejected Dr. Ali's opinion that Mausehund's symptoms would interfere with her ability to maintain attention and concentration, finding that none of Dr. Ali's treatment notes suggested that Mausehund had any cognitive or attention deficits. (R. 1009).

Mausehund asserts that the ALJ erred because she didn't explain inconsistencies between her rationale and her evaluation of Dr. Ali's opinion in the first hearing decision. Mausehund also says that substantial evidence doesn't support the ALJ's reasons for discounting aspects of Dr. Ali's opinion. In the first ALJ hearing decision, the ALJ gave Dr. Ali's opinion that Mausehund "could lift/carry less than 10 pounds frequently and 20 pounds occasionally, grasp, finger, and reach for 75% of a workday, and bend/twist at the waist for 50% of the workday," little weight "because it does not address the period at issue. Also, Dr. Ali is only the claimant's primary care physician." (R. 29). But in the second hearing decision, the ALJ gave Dr. Ali's opinion about Mausehund's ability to lift and carry "great weight," stating that the medical exams in the record supported this opinion. (R. 1008).

Though the ALJ's treatment of Dr. Ali's opinion on Mausehund's ability to lift and carry changed between the two hearing decisions, Mausehund has cited no regulation or legal authority that required the ALJ to explain this inconsistency. And the Appeals Council has vacated the ALJ's first hearing decision, so this court's review is limited to whether substantial evidence supports the ALJ's findings in the second hearing decision. *See Brewer o/b/o Arriaga v. Berryhill*, 2020 WL 514231, at *7–8 (N.D. Ala. Jan. 31, 2020). Plus, there's a simple explanation for why the ALJ's rationale changed. The Appeals Council vacated the first hearing decision, in part, because (a) it appeared Dr. Ali's opinions did relate to the period at issue, and (b) it wasn't clear why Dr. Ali's relationship as Mausehund's primary care physician should detract from the weight given Dr. Ali's opinion. (R. 1109). As a result, the court finds no error in the ALJ's failure to explain why she weighed parts of Dr. Ali's opinion differently on remand or why her analysis of Dr. Ali's opinion changed.

Mausehund also asserts that the ALJ erred in affording little weight to Dr. Ali's opinion that Mausehund could sit for only 4 hours in an 8-hour day and needed to be allowed to alternate between sitting and standing at will. According to Mausehund, Dr. Goodman's progress notes, which reflect that Mausehund's symptoms included leg pain, numbness, paresis, paresthesias, tingling, and weakness, support this opinion from Dr. Ali. (R. 516). Mausehund also points out that she reported to Dr. Goodman that her symptoms are aggravated by bending, position, standing, sitting, and stress and that she experiences stiffness all day. (*Id.*). But the ALJ cited substantial evidence to support her decision to give little weight to Dr. Ali's opinion, noting that Mausehund's medical exams didn't show that she had a limited ability to sit or that she had abnormal sensation in her lower extremities other than the few occasions that she had abnormal sensation in the lateral aspect of her left foot. (R. 727, 771–774, 928, 1756).

Though Mausehund argues otherwise, substantial evidence also supports the ALJ's decision to give little weight to Dr. Ali's opinion that Mausehund's pain and other symptoms would affect her ability to maintain attention and concentration. Mausehund points out that during her first visit with Dr. Ali she reported suffering from back pain for 16 years. (R. 724). Mausehund also says that Dr. Harvey's treatment notes support this opinion from Dr. Ali. For example, Mausehund points out that she complained to Dr. Harvey of back pain and bilateral pain, worse on the left side. (R. 800). She also complained of pain in the buttock and posterior leg, which she said was worse with bending and twisting and alleviated by lying down. (*Id.*). Dr. Harvey also noted that Mausehund had a history of lumbar diskectomy and had tried physical therapy and pain injunctions without relief. (*Id.*). As Mausehund notes, Dr. Harvey's exam revealed that Mausehund had a positive straight leg raise, on the left, at 45 degrees and diminished range of motion in the lumbar spine. (R. 801–02). Finally, Dr. Harvey assessed that Mausehund suffered from "back pain with left sciatic pain consistent with sciatica due to [her] disk herniation and spondylolisthesis." (R. 802).

But the ALJ cited substantial evidence to support her finding that Mausehund's pain and other symptoms didn't affect her ability to maintain attention or concentration as much as Dr. Ali said it did, noting that Dr. Ali's treatment notes and the other exams in the record didn't reveal cognitive or

attention deficits on exam. (R. 727–28, 1754–64, 1766–67). And it's not the court's job to "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Winschel*, 631 F.3d at 1178. So Mausehund hasn't shown that the ALJ reversibly erred in evaluating Dr. Ali's opinions.

2. <u>Dr. Goodman</u>: Mausehund says that the ALJ also erred when she failed to give the opinion of Dr. Goodman, another treating physician, controlling or significant weight. In his treating source statement, Dr. Goodman stated that Mausehund's impairments caused her to suffer from frequent headaches and prevented her from staying seated or standing for more than 30 minutes at a time. (R. 1347). According to Dr. Goodman, Mausehund's pain and other symptoms would constantly interfere with her attention and concentration, and Mausehund suffered from a severe limitation in the ability to deal with work stress. (R. 1349–50). Mausehund also couldn't walk any city blocks without needing to rest and could sit or stand/walk for less than 2 hours in an 8-hour workday. (R. 1350–51). Dr. Goodman also stated that Mausehund: (1) needed a cane or other assistive device, (2) can never lift or carry anything between 10 and 50 pounds, and (3) had significant limitations in doing repetitive reaching, handling, or fingering. (R. 1352).

The ALJ gave Dr. Goodman's opinions no significant or controlling weight, finding that they contradicted his own treatment notes and the other clinical exams in the record from the relevant period. (R. 1009). In rejecting Dr. Goodman's opinions that Mausehund could stand, walk, or sit for less than 2 hours each in an 8-hour day and needed a cane, the ALJ pointed out that Dr. Goodman's exams before Mausehund's date last insured revealed no neurologic abnormalities, musculoskeletal abnormalities, pulmonary abnormalities, or psychiatric abnormalities. (*Id*.). And though the ALJ recognized that some exams in 2014 showed a reduced range of motion and tenderness in Mausehund's lumbar spine, she stated that none of the medical exams showed any motor strength deficits, gait abnormalities, or other abnormalities that supported Dr. Goodman's opinions about Mausehund's ability to sit, stand, or walk. (*Id*.). The ALJ also noted that Mausehund's medical records didn't suggest that she used an assistive device before her date last insured. (*Id*.).

15

As for Dr. Goodman's opinions that Mausehund couldn't lift any weight and had significant limitations in repetitive reaching, handling, or fingering, the ALJ noted that the record showed no abnormalities in Mausehund's upper extremities or neck before the date last insured. (R. 1009). Finally, the ALJ rejected Dr. Goodman's opinion that Mausehund's symptoms would constantly interfere with her ability to maintain attention and concentration for the same reasons why she rejected Dr. Ali's opinion about the effect of Mausehund's symptoms on her attention and concentration. (R. 1009–10). Mausehund's treatment notes didn't suggest any cognitive or attention deficits, and despite Mausehund's subjective reports of pain, none of the exams that predate her date last insured showed deficits in attention, concentration, or any other aspect of mental function. (R. 1010).

Mausehund points to several progress notes from Dr. Goodman that she says the ALJ overlooked in giving no significant weight to Dr. Goodman's opinions about her ability to sit, stand, or walk. (Doc. 14, p. 14). But as the ALJ pointed out, Dr. Goodman's exams didn't reveal abnormalities that supported his opinions about Mausehund's ability to sit, stand, or walk. (R. 695–96, 701, 706–07, 712–13, 715, 2722). And though Mausehund says the ALJ overlooked evidence that she needed a cane or other assistive device, Mausehund hasn't shown that the ALJ's statement that her medical records didn't show that she used assistive devices **before her date last insured** was incorrect. Instead, Mausehund points to treatment notes from Dr. Goodman over a year after her date last insured and a statement from a consultative examiner that Mausehund "ambulated slowly **but without assistance** through the hallway and examining room" to argue that substantial evidence doesn't support the ALJ's decision to discount Dr. Goodman's opinion that Mausehund needed a cane. (R. 1359, 657 (emphasis added)). Having reviewed the evidence cited by both Mausehund and the ALJ, the court finds that substantial evidence supports the ALJ's decision to give no significant weight to Dr. Goodman's opinions about Mausehund's ability to sit, stand, and walk.

The court also finds that the ALJ adequately supported her decision to give no significant weight to Dr. Goodman's opinion that Mausehund's symptoms would constantly affect her ability to maintain attention and concentration. According to Mausehund, the ALJ overlooked the fact that pain can affect concentration and that her medical records repeatedly documented

complaints of pain. But in assessing this opinion, the ALJ recognized that Mausehund's medical records included subjective reports of pain from her headaches and other impairments. (R. 1010). The ALJ, however, discounted Dr. Goodman's opinion because Mausehund's medical records from before her date last insured didn't show any deficits in concentration, attention, or other areas of mental functioning. (*Id.*). Substantial evidence supports this finding. (R. 495–621, 686–715, 727–28, 864–944, 1423–1739, 1754–64, 1766– 67, 2536–3108). So Mausehund hasn't shown that the ALJ reversibly erred in evaluating Dr. Goodman's opinions.

3. <u>Lack of consultative exam</u>: Mausehund also appears to fault the ALJ for not having a neurologist, psychologist, or psychiatrist testify as an expert at the ALJ hearing. (Doc. 14, p. 9). The court finds this argument waived because it is raised in a perfunctory manner without citation to any relevant authorities or parts of the record. *See Singh*, 561 F.3d at 1278. This argument also fails because there was enough evidence in the record for the ALJ to make a determination about Mausehund's mental impairments, and Mausehund, who was represented by counsel during the administrative process, was the one responsible for providing evidence related to her disability. *See Sarria v. Comm'r of Soc. Sec.*, 579 F. App'x 722, 724 (11th Cir. 2014).

4. <u>State agency consultants</u>: Mausehund's last opinion evidence related argument is that the ALJ erred in giving more weight to the opinions of the State agency consultants than the opinions of Dr. Ali and Dr. Goodman. As explained, substantial evidence supported the ALJ's reasons for giving less than substantial or considerable weight to most of Dr. Ali and Dr. Goodman's opinions. Substantial evidence also supports the ALJ's decision to give greater weight to the opinions of the State agency consultants because their opinions reflected Mausehund's medical records and Dr. Ali's opinions about Mausehund's ability to stand, walk, lift, and carry. *See Putman v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 929, 934 (11th Cir. 2017).

## C.      Residual Functional Capacity Assessment

Mausehund next attacks the ALJ's residual functional capacity assessment arguing that the ALJ erred in (a) rejecting her subjective pain testimony about her headaches and vision problems, and (b) not adequately discussing her obesity's affect on her functional limitations.

1. <u>Subjective pain testimony</u>: An ALJ must apply the two-step "pain standard" to subjective testimony about pain or other symptoms. Under this standard, the claimant must first present "evidence of an underlying medical condition." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). If she does, the claimant must then either: (a) present "objective medical evidence confirming the severity of the alleged pain," or (b) show "that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *See id*. This court "will not disturb a clearly articulated credibility finding supported by substantial evidence." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

*a. Headaches*: At the ALJ hearing, Mausehund testified that during the relevant period she suffered from daily headaches that she rated as a 10/10 on the pain scale. (R. 1010). Mausehund also said that her headaches would last for weeks at a time and that treatment and medication didn't manage them. (*Id*.). The ALJ acknowledged that Mausehund sought treatment for headaches at multiple emergency rooms on multiple occasions. (*Id*.). But the ALJ found Mausehund's statements about the severity of her headaches were "not fully consistent with the evidence." (*Id*.). To support this finding, the ALJ pointed out that Dr. Harvey's treatment notes state that Mausehund's headaches improved significantly after a shunt pressure adjustment. (R. 1010, 751, 926). The ALJ also stated that the record didn't suggest that Mausehund's headaches occurred as often or lasted as long as she alleged at the hearing, pointing out that Mausehund didn't have issues making her medical appointments during the relevant period. (R. 1010). Plus, the ALJ pointed out that during several of Mausehund's emergency room visits, treatment providers questioned the validity of her pain complaints because of her emergency room behavior. (R. 1010, 757–63, 1640, 1715).

The above analysis shows that Mausehund is incorrect to say that the ALJ found that there wasn't evidence of Mausehund's chronic headaches in the record. The ALJ instead found that the record didn't support Mausehund's statements about the severity of her headaches. In other words, the ALJ "found that [Mausehund's] condition could reasonably be expected to give rise to some pain, but it did not give rise to the *claimed* pain." *Whitmore v. Soc. Sec. Admin., Comm'r*, 855 F. App'x 641, 643 (11th Cir. 2021) (quotations omitted). The ALJ thus correctly articulated the pain standard. Having considered the ALJ's rationale for discrediting Mausehund's testimony about the severity of her headaches and the evidence cited by both Mausehund and the ALJ, the court finds that substantial evidence supports the ALJ's credibility determination. *See Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) ("The question is not . . . whether ALJ could have reasonably credited [Mausehund's] testimony but whether the ALJ was clearly wrong to discredit it.").

b. *Vision*: Mausehund also asserts that the ALJ erred in questioning the validity of her visual impairments. But again, the ALJ didn't find that Mausehund didn't suffer from vision problems, and in fact, limited Mausehund to work that didn't require frequent use of field of vision or frequent far acuity. The ALJ instead found that Mausehund wasn't "as visually impaired as she alleged." (R. 1010). The ALJ cited substantial evidence to support this finding. For example, consultative examiner Dr. Hillman stated that Mausehund's "decreased visual acuity or visual field measurements [weren't] consistent with [his] examination" though he did find them consistent with Mausehund's history. (R. 657). And Dr. Nichols, a neuro ophthalmologist specialist, found Mausehund's visual field testing "very unreliable." (R. 77, 94, 332). Plus, Mausehund's treatment notes don't suggest that her vision impairments were as severe as she alleged at the ALJ hearing. As substantial evidence supports the ALJ's credibility determination and Mausehund doesn't explain what visual limitations she has that the ALJ didn't account for, the court finds that the ALJ didn't err in assessing Mausehund's visual impairments.

2. <u>Obesity</u>: Mausehund next says that the ALJ didn't adequately consider the functional limitations of her obesity as required by SSR 19-2p. SSR 19-2p says that an ALJ must consider the limiting effects of a medically determinable impairment of obesity when assessing a claimant's residual functional capacity. SSR 19-2p, 2019 WL 2374244, at *4. And as with any other

impairment, an ALJ must explain how she reached her conclusions on whether obesity causes any limitations. *See id.* ALJs must also keep in mind that "[t]he combined effects of obesity with another impairment(s) may be greater than the effects of the impairments considered separately." *Id.*

At Step 3, the ALJ recognized that SSR 19-2p required her to consider Mausehund's obesity in determining whether Mausehund had a severe medically determinable impairment, whether Mausehund had an impairment that met or equaled a listing, and in determining Mausehund's residual functional capacity. (R. 998). The ALJ then noted that obesity can aggravate co-existing impairments. (*Id.*). For example, the ALJ explained that someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. (*Id.*). The ALJ also recognized "obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour, five-day week or equivalent schedule." (*Id.*). Finally, the ALJ stated that she accounted for these considerations in Steps 2–5 of the five-step process. (*Id.*). And in her residual functional capacity discussion, the ALJ referred to Mausehund's BMI levels and treatment notes that showed she was obese. (R. 1000–06). So the court rejects Mausehund's argument that the ALJ didn't adequately consider her obesity along with her other impairments.

### D.   Vocational Expert Testimony

Mausehund finally argues that the ALJ erred at Step 5 in relying on the vocational expert's testimony to find her not disabled because the hypothetical question posed to the vocational expert didn't include all her limitations. "[F]or a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Winschel*, 631 F.3d at 1180 (quotations omitted). But if substantial evidence supports the ALJ's finding that the claimant does not have a particular limitation, the ALJ need not include that limitation in her hypothetical question to the vocational expert. *See Crawford*, 363 F.3d at 1161.

As explained, substantial evidence supports the ALJ's finding that Mausehund's headaches and visual impairments weren't as severe as she alleged. The ALJ also reasonably determined that Mausehund had no

limitation in the four areas of mental functioning. And Mausehund hasn't shown that she has any other limitation not accounted for by the ALJ. So the court rejects Mausehund's argument that the hypothetical question that the vocational expert relied on was deficient.

## IV.   CONCLUSION

The court has reviewed the parties' briefs, the ALJ's findings, and the record evidence and finds that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. So the court will **AFFIRM** the SSA's denial of benefits. The court will enter a separate final order that closes this case.

**Done** on February 20, 2024.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE